# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| JAMES POLIDORO, | : | Civ. No. 09-6392 (KM) |
| Plaintiff, | : | |
| | : | OPINION |
| v. | : | |
| GERALD SALUTI, | : | |
| Defendant. | : | |

This case comes before the court on the motion of the plaintiff, James Polidoro, for a default judgment in this legal malpractice case. (ECF Nos. 43, 44, 55) Though unopposed, the case has been delayed by a stay in bankruptcy, changes of counsel, and multiple requests for adjournments. Indeed, this motion for a default judgment was filed only after one dismissal for failure to prosecute the case, and a second threatened dismissal.

Polidoro essentially alleges that his attorney failed to file a civil rights action within the statute of limitations. I will enter a default judgment that compensates Polidoro for $12,820.13 in fees and expenditures occasioned by his attorney's deficient representation. I find, however, that the underlying civil rights action had little or no chance of success. I assign it a value of $5000. Judgment will be entered in a total amount of $17,820.13.

## I.     Allegations of the Complaint

In 1999, Polidoro pled guilty in this District to certain federal charges. *See* Crim. No. 98-560. (What charges, he says, are at issue; I'll explain below.) He was sentenced to a term of imprisonment of 21 months. Released from custody on December 21, 2000, he began serving a three year term of supervised release.

1

Polidoro alleges that he met with an attorney, defendant Gerald Saluti,[1] shortly after his release, in January 2001. His intent was to file a "multicount civil action," arising from the events surrounding his guilty plea and imprisonment. Defendants were to include the United States District Court for the District of New Jersey, the U.S. Attorney's Office, and Polidoro's defense attorney, Pasquale Giannetta. (Amended Complaint ("AC") ¶ 2)[2] Saluti allegedly advised Polidoro that he would file a notice of claim, that the two-year statute of limitations for filing Polidoro's action would be tolled until December 21, 2003, and that it would expire on December 21, 2005. (AC ¶ 7)

On April 5, 2003, Polidoro and Saluti came to an agreement on the terms of Saluti's retention, and Polidoro gave Saluti a check for $1000. (AC ¶¶ 9–10; *id.* ¶ 17 ("Gerald M. Saluti accepted James J. Polidoro's written offer on April 5th, 2005, to represent him [and] Gerald M. Saluti received consideration in the amount of $1,000....")) The two remained in touch by telephone, and Saluti assured Polidoro that he would timely file the civil action. (AC ¶ 12) Saluti did not file the action within the limitations period, or indeed ever.[3] In January

---

[1]    I take judicial notice that the online New Jersey roll of attorneys contains only one G. Saluti, attorney no. 041631992, admitted 12/22/1992. His status is listed as "suspended." https://njcourts.judiciary.state.nj.us/web15z/AttyPAWeb/pages/home.faces (visited Dec. 2, 2015) A Westlaw search discloses that Gerald M. Saluti has twice been suspended from the practice of law by the New Jersey Supreme Court. *See In the Matter of Gerald M. Saluti, an Attorney at Law*, 27 A.3d 190 (N.J. 2011); *In the Matter of Gerald M. Saluti, an Attorney at Law*, 83 A.3d 69 (N.J. 2014). At least as to the second suspension, this Court imposed a mirror-image suspension from practice before the U.S. District Court for the District of New Jersey. Order of Suspension dated Aug. 21, 2014, *In re Gerald M. Saluti, An Attorney-at-Law*, Misc. No. 13-00252 (ECF No. 6).

[2]    The list in the Amended Complaint is actually somewhat shorter. I have given plaintiff the benefit of the doubt in supplementing it to include persons and entities named in the affidavit he submitted on this motion. (ECF No. 55-1 at pp. 4–5)

[3]    Because that civil rights action was never filed at all, a precise calculation of the limitations period and any tolling periods is not critical. In general, Section 1983 claims and their State analogues are subject to New Jersey's two-year statute of limitations. *See Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013) (per curiam) (citing *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010)). "Under federal law, a cause of action accrues, and the statute of limitations begins to run when the plaintiff knew or should have known of the injury upon which its action is based." *Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (internal quotation marks and

2006, Saluti allegedly called Polidoro and apologized, stating that he "fell off the wagon in terms of alcohol use."

Polidoro filed this legal malpractice action *pro se* on December 18, 2009.[4] The Amended Complaint[5] asserts causes of action for breach of contract, breach of contract/client instructions, breach of implied contract, negligence, and negligent infliction of emotional distress. It asserts two more counts of fraud and negligent misrepresentation in connection with lifting the automatic stay in Saluti's subsequent bankruptcy case, when Saluti purposely or negligently represented that malpractice insurance would cover the loss.

The gist of the damages claim is that, if Saluti had filed the action against the federal defendants, Polidoro would have received damages or a settlement. Saluti's malpractice allegedly deprived Polidoro of such an award, and also resulted in out of pocket expenses that Polidoro seeks to recoup.

## II.    Default Judgment

"[T]he entry of a default judgment is left primarily to the discretion of the district court." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) (citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951)). Because the entry of a default judgment prevents the resolution of claims on

---

citations omitted). "As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury." *Id.* (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979)). *Bivens* statutes of limitations have been construed in parallel fashion. *Napier v. Thirty or More Unidentified Federal Agents, Employees, or Officers*, 855 F.2d 1080, 1087 n.3 (3d Cir. 1988). A claim under the Federal Tort Claims Act must be presented in writing to the relevant agency within two years. 28 U.S.C. § 2401(b).

[4]    On March 31, 2010, Joseph Christian Amann appeared as counsel (ECF No. 7); on October 14, 2010, Amann withdrew and Timothy P. McKeown was substituted (ECF No. 11); on September 25, 2012, McKeown was permitted to withdraw (ECF No. 29); and on June 19, 2013, current counsel, Jamison Michael Mark, appeared (ECF No. 32). It was Mark's firm that filed the currently operative Amended Complaint (ECF No. 38) and this motion for a default judgment (*see* ECF Nos. 43, 44, 55).

[5]    The Amended Complaint (ECF No. 38) was filed by subsequently retained counsel. It contains most of the same facts, but omits much extraneous discussion and citation of legal sources that were in the original *pro se* complaint.

3

the merits, "this court does not favor entry of defaults and default judgments." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984). Thus, before entering default judgment, the Court must determine whether the "unchallenged facts constitute a legitimate cause of action" so that default judgment would be permissible. *DirecTV, Inc. v. Asher*, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006) (citing 10A Wright, Miller, Kane, Fed. Prac. & P. Civil 3d § 2688, at 58–59, 63).

### A.    Prerequisites to entry of default judgment

Before a court may enter default judgment against a defendant, the plaintiff must have properly served the summons and complaint. In addition, the defendant must have failed to file an answer or otherwise respond to the complaint within the time provided by the Federal Rules, which is ordinarily twenty-one days. *See Gold Kist, Inc. v. Laurinburg Oil Co., Inc.*, 756 F.2d 14, 18–19 (3d Cir. 1985); Fed. R. Civ. P. 12(a).

Service of an individual may be made under the Federal Rules by doing any of the following:

> (A) delivering a copy of the summons and of the complaint to the individual personally;
>
> (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
>
> (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e)(2).[6]

The record contains an affidavit of service for both the original and the amended complaint. According to those affidavits: (1) the original complaint

---

[6]    Service may also be made by following state law procedures applicable to an action brought in courts of general jurisdiction where the district court is located or where service is made. Fed. R. Civ. P. 4(e)(1). Saluti and this court are found in New Jersey, and the New Jersey rule for serving individuals mirrors the Federal Rule, so the point is not consequential here. *See* N.J. Ct. R. 4:4-4(a)(1).

4

was served personally on Mr. Saluti by a professional process server on February 12, 2010 (ECF No. 6), and (2) the amended complaint was served on Saluti's authorized agent by a professional process server on September 3, 2014 (ECF No. 41).

Neither complaint has been answered. No one has entered an appearance on behalf of the defendant, Mr. Saluti. On December 29, 2014, the Clerk entered default as to Mr. Saluti for failure to plead or otherwise defend the action. (Unnumbered Docket entry following ECF No. 45)

The prerequisites for a default judgment have therefore been met.

### B.    Factors governing appropriateness of default judgment

After the prerequisites have been satisfied, a court must evaluate the following three factors: "(1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987)). Those factors, considered in light of the record of this case, weigh in favor of entry of a default judgment.

### 1.    Factor 1 – Meritorious defense

The legal malpractice claims pled in the amended complaint appear to have legal merit.[7] In assessing them, I must take the factual allegations of the complaint as true, and defendant is deemed to have admitted them. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990); *Doe v. Simone*, 2013 WL 3772532, at *2 (D.N.J. July 17, 2013) (citing *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 536 (D.N.J. 2008)). Applying that

---

[7]    Here, and throughout, it is important to keep in mind the distinction between the legal malpractice causes of action against Saluti, and the hypothetical causes of action that Polidoro sought to bring against the prison system, the judge, and the prosecutors. Here I focus on the legal malpractice claim itself.

standard, I find that Polidoro has stated claims for, *e.g.*, breach of contract and negligence.

No extensive legal discussion is required. Under New Jersey law, the elements of a breach of contract are that (1) the parties entered into a valid contract; (2) the defendant failed to perform its contractual obligation; and as a result, (3) the plaintiff sustained damages. *Sheet Metal Workers Int'l Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc.*, 737 F.3d 879, 900 (3d Cir. 2013) (citing *Coyle v. Englander's*, 488 A.2d 1088 (N.J. Super. Ct. App. Div. 1985)). Considered as a claim of negligence, legal malpractice has three essential elements: "(1) the existence of an attorney-client relationship creating a duty of care upon the attorney; (2) the breach of that duty; and (3) proximate causation." *Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1070 (N.J. 1996) (quoting *Lovett v. Estate of Lovett,* 593 A.2d 382 (N.J. Super. Ch. Div. 1991)).[8] Accepting a case, entering into a legal engagement, depositing the client's retainer check, disregarding the client's instructions, and doing literally nothing to pursue the case clearly constitute malpractice. Such conduct breaches the contract between attorney and client, and also falls short of any reasonable standard of professional care. *See, e.g., Hoppe v. Ranzini*, 385 A.2d 913, 916 (N.J. Super. Ct. App. Div. 1978) ("Failure to file suit before the running of the period of the statute of limitations plainly constitutes malpractice where there is no reasonable justification shown therefor.") As for proximate cause and damages, Polidoro has at the very least articulated a claim to recover what he paid the attorney. I further discuss the issues of proximate cause and damages below.

---

[8]     All legal malpractice claims, whether in tort or contract, are governed by a six-year statute of limitations. *McGrogan v. Till*, 771 A.2d 1187, 1188 (N.J. 2001) (applying N.J. Stat. Ann. § 2A:14-1).

### 2.    Factors 2 and 3

The second and third factors—prejudice to Polidoro, and the culpability of Saluti for the default—also weigh in favor of a default judgment.

Polidoro has been prejudiced by Saluti's failure to participate because he has been "prevented from prosecuting [the] case, engaging in discovery, and seeking relief in the normal fashion." *See Teamsters Pension Fund of Philadelphia & Vicinity v. Am. Helper, Inc.*, 2011 WL 4729023, at *4 (D.N.J. Oct. 5, 2011) (finding that a defendant's failure to answer prejudices the plaintiff); *see also Gowan v. Cont'l Airlines, Inc.*, 2012 WL 2838924, at *2 (D.N.J. Jul. 9, 2012) ("Plaintiff will suffer prejudice if the Court does not enter default judgment as Plaintiff has no other means of seeking damages for the harm allegedly caused by Defendant."). The prejudice factor, then, weighs in favor of a default judgment.

The culpability factor, too, weighs in favor of a default judgment. Absent any evidence to the contrary, "the Defendant's failure to answer evinces the Defendant's culpability in [the] default." *Teamsters,* 2011 WL 4729023 at *4. Here, as in *Teamsters,* "there is nothing before the Court to show that the Defendant's failure to file an answer was not willfully negligent." *Id.* (citing *Prudential Ins. Co. of America v. Taylor*, 2009 WL 536043, at *1 (D.N.J. Feb. 27, 2009) (finding that when there is no evidence that the defendant's failure to answer the complaint was due to something other than its own willful negligence, the defendant's conduct is culpable and default judgment is warranted)).

Indeed, Saluti's failure to answer seems to have stemmed from something more than mere negligence or inattention. According to the uncontradicted affidavits of service, Saluti was properly served with the original and amended complaints. It further appears that Saluti has declared bankruptcy. Records attached by Polidoro demonstrate that Saluti had actual notice of this malpractice action and consented to lift the stay in bankruptcy so that Polidoro could pursue his claims against Saluti's malpractice carrier. The

carrier, however, disclaimed coverage. (ECF No. 55-2 at pp. 2, 6) In short, there is every reason to think that Saluti's failure to answer was purposeful and calculated—a cost-benefit analysis in light of his insolvency.

For the foregoing reasons, I find that entry of a default judgment is appropriate and justified.

## III.  DAMAGES

As to liability, the allegations of the complaint are deemed true. Not so as to damages. "[D]efendants are deemed to have admitted the factual allegations of the Complaint by virtue of their default, except those factual allegations related to the amount of damages." *Doe*, 2013 WL 3772532 at *2. While "courts must accept the plaintiff's well-pleaded factual allegations as true," they "need not accept the plaintiff's factual allegations regarding damages as true." *Id.* (citing *Chanel, Inc.*, 558 F. Supp. 2d at 536).

Further, if a court finds evidentiary support to be lacking, it may order or permit a plaintiff seeking a default judgment to provide additional evidence. *Doe*, 2013 WL 3772532 at *2. In this case, I did request that counsel document the damages requested by submitting affidavits in lieu of direct testimony. Counsel has submitted a 22-page affidavit of Mr. Polidoro, with 28 exhibits attached. (ECF No. 55)[9]

---

[9]    Having received the motion for default judgment, beginning on March 23, 2015, I attempted to schedule a hearing on damages, with certifications of witnesses in lieu of direct testimony to be submitted in advance. (ECF Nos. 46–53) Each time, Polidoro's counsel contacted chambers two days or less before the scheduled hearing date and requested an adjournment, citing his need to prepare. Granting counsel's fifth requested adjournment, until September 15, 2015, I entered a text order explicitly stating that failure to submit witness certifications seven days in advance of the adjourned date would "be considered a waiver of the right to offer the witness's testimony on that party's direct case." (ECF No. 52) On Friday, September 11, 2015, having already blown the date to submit certifications, counsel telephoned chambers to request a sixth adjournment, and was told to put his request in writing. On Monday, September 14, 2015, the day before the scheduled hearing, counsel filed a letter requesting the adjournment. (ECF No. 53) I entered an order cancelling the hearing. The order stated that the failure to submit witness statements constituted a waiver of the hearing (although I reserved the right to convene a hearing if appropriate). The order directed counsel to submit his proofs of damages in the form of

Polidoro seeks two categories of damages, one documented and "liquidated," and the other general and "unliquidated."

## A.   The "Liquidated" Damages

The liquidated damages are appropriately awarded here. These consist largely of legal fees: $1000 paid to Saluti, as well as fees and expenses in connection with this case and the lifting of the automatic stay in Saluti's bankruptcy case. New Jersey has been quite liberal, perhaps uniquely so, in permitting legal malpractice plaintiffs to recover attorneys' fees. *See Saffer v. Willoughby,* 670 A.2d 527, 534 (N.J. 1996); *see also* R. Israel, D. Dugan, B. Gladis, "Legal Malpractice Claims Can Be Brought By Nonclients," 219 N.J.L.J. 148 (special section, p. S-4) (Jan. 19, 2015) (observing that *Saffer* rule is unique to New Jersey). Polidoro has documented these expenditures, attaching relevant statements of account and correspondence. (ECF No. 55-9 at pp. 30–37) I will award these liquidated damages, which total $12,820.13.

## B.   "Suit-Within-A-Suit" Damages: Main Claims

Here is the theory behind the "unliquidated" component of damages: If Saluti had timely filed Polidoro's action against the court, the prosecutors, and the prison system, Polidoro would have received an award of damages or a cash settlement. Polidoro cites assurances by Saluti that his case was worth at least $2 million. Even if he had appeared in this action, however, Saluti would not have been in a position to "admit" that third parties wronged plaintiff and were liable in damages. I must therefore scrutinize such hypothetical claims closely, and make an independent assessment as to their viability.

For legal malpractice claims, New Jersey has employed the "suit-within-a-suit" method of ascertaining damages. That is, the court in the malpractice action must attempt to determine the amount of the award plaintiff would have obtained if his claim had been pursued by a competent attorney:

---

affidavits, with exhibits, by September 22, 2015. (ECF No. 54) He did so. (ECF No. 55) Because there is no adversary, because live testimony of the plaintiff could add little to his lengthy affidavit, and because counsel has not proffered an affidavit or testimony of any other witness, I have elected to decide this issue on the papers.

> The most common way to prove the harm inflicted by malpractice or other misconduct that adversely affected the outcome in the underlying action is a suit-within-a-suit. *Garcia v. Kozlov, Seaton, Romanini, & Brooks, P.C.*, 179 N.J. 343, 358, 845 A.2d 602 (2004). Plaintiff's burden is to prove by a preponderance of the evidence that but for the malpractice or other misconduct, "'(1) he would have recovered a judgment in the action against the main defendant, (2) the amount of that judgment, and (3) the degree of collectibility of such judgment.'" *Ibid.* (quoting *Hoppe v. Ranzini*, 158 N.J. Super. 158, 165, 385 A.2d 913 (App. Div. 1978)).

*Kranz v. Tiger*, 914 A.2d 854, 860 (N.J. Super. Ct. App. Div. 2007). The cited *Hoppe* case applied that suit-within-a-suit methodology to a malpractice claim, like this one, that an attorney had blown the statute of limitations. I find that methodology to be appropriate here.

### 1.    The factual allegations of Polidoro's intended lawsuit

I here summarize the hypothetical allegations that Polidoro intended to include in the civil rights action he wanted Saluti to file. For context, I have supplemented Polidoro's account with certain indisputable facts of public record from the Court's docket, particularly with regard to the underlying criminal case against Polidoro.

Count 1 of the Indictment alleges a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). The alleged criminal enterprise consists of members of the North Jersey Faction of the Bruno-Scarfo Organized Crime Family. It further alleges that Polidoro, an associate of that crime family, "collected extortionate loans" for a codefendant named Oliveri.  (Indictment, copy at ECF No. 55-6 at p. 6) Other counts that name Polidoro as a defendant are Count 2 (racketeering, 18 U.S.C. § 1962(c)); Count 3 (conspiracy to collect extensions of credit by extortionate means, 18 U.S.C. § 894); Counts 6–10 (collection of extensions of credit by extortionate means, 18 U.S.C. § 894); and Count 21 (illegal gambling business, 18 U.S.C. § 1955).

Polidoro alleges that he pled guilty in 1999 to "one (1) count of Collection of Extension of Credit by Extortionate Measures at a level 15 [of the Federal Sentencing Guidelines for 1998]." (Affidavit of James J. Polidoro ("PA"), ECF No. 55-1, ¶ 27) At all times, he says, he was adamant that he picked up gambling

proceeds, but never threatened anyone. And the Court's Judgment, he says, should have reflected that benign fact: this was, he says, a plea to "'1 count of extortionate extension of credit' which should have fallen under either Count 3 or Counts 6–10 which related to Section 18:894." (PA ¶ 30)

The notion that the guilty plea "should have fallen" under some count other than Count 1 is impossible to square with the record. The Court has obtained copies of the plea agreement and the transcript of the plea. (Neither was attached to Polidoro's papers.)[10] It is crystal clear that Polidoro pled guilty to Count 1 and knew he was doing so. (I discuss the details below in Section II.B.3.)

The rest of Polidoro's allegations largely stem from this alleged inconsistency between his guilty plea and the Court's Judgment. In summary, those factual allegations are:

1. After seeing his judgment for the first time, Polidoro brought the alleged error to the attention of the court. The clerk replied that the docket reflected the correct information.

2. Based on the alleged error as to the offense of conviction, the Bureau of Prisons ("BOP") denied Polidoro admission to a "boot camp" program, despite the sentencing judge's recommendation that he be admitted.

3. On May 25, 1999, AUSA Ron Wigler, who was assigned to the case, sent a letter to the Bureau of Prisons stating that Polidoro should be

_____

[10]    I obtained the plea transcript from the court reporter, and the plea agreement from the docket. *See* pp. 17–19, *infra.* I am empowered to take judicial notice of prior proceedings before this Court. *See generally Freshman v. Atkins,* 269 U.S. 121, 124 (1925) (adverting to general rule that court may take judicial notice of "its own records another, but interrelated, proceeding"); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 416 n.3 (3d Cir. 1988). And even in the context of a motion to dismiss, I would be permitted to consider the guilty plea, proceedings which are cited and relied on in the complaint. *See Schmidt v. Skolas,* 770 F.3d 241, 249 (3d Cir. 2014) (documents "integral to or explicitly relied upon in the complaint"); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999) ("To resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.").

kept separate from certain other prisoners. Polidoro was placed on "CIM [Central Inmate Monitoring] separation status."

4. The FBI delayed in identifying the particular persons from whom Polidoro should be segregated, and the Bureau of Prisons was derelict in not learning these facts before designating Polidoro to Ft. Dix. As a result, Polidoro was in segregation for 87 days before ultimately being transferred out of Ft. Dix. [11]

5. In October 1999 BOP personnel told Polidoro he would be recommended for service of the last five months of his sentence in a halfway house. In May 2000 that application was denied, however, based on Polidoro's CIM Separation status.

6. On July 13, 2000, AUSA Wigler wrote to the Bureau of Prisons that he had no objection to rescinding the "keep separate" order as to Polidoro in order to permit designation to a halfway house.

7. The denial of the halfway house designation apparently went through the administrative appeal process. On October 26, 2000, Polidoro received a final decision that designation to a halfway house was within the warden's discretion and that it was denied because Polidoro represented a "threat to the community" based on "your instant offense and associations."

I temporarily set aside some miscellaneous claims, which are discussed in section III.C, *infra*.

### 2.     Possible claims and threshold barriers to suit

Polidoro's affidavit refers to the "civil rights" laws without further elaboration, and also lists a number of state-law torts.

A *Bivens*-style civil rights action against individual officers might have been intended. *See Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971).

---

[11]     The implication is that Polidoro was segregated as a means of keeping him separate from certain other prisoners, who had not yet been properly identified by the FBI. Polidoro does not claim that he was, for example, placed in solitary confinement as a form of discipline.

A *Bivens* action based on certain violations of the Fourth, Fifth, and Eighth Amendments may lie against individual federal officers, but not against the government or its agencies. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71–72 (2001).

Although Polidoro does not name the United States as a potential defendant, he might also have been considering a tort claim under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80. The FTCA, a limited waiver of sovereign immunity, provides a vehicle for bringing state tort claims against the United States.[12] The FTCA exempts claims based on an officer's exercise of judgment or choice in the performance of the officer's discretionary functions. *See* 28 U.S.C. § 2680(a); *United States v. Gaubert,* 499 U.S. 315, 323 (1991) (discretionary functions are "actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations"). That discretionary-function exception does not extend, however, to a narrow class of claims based on intentional torts, such as assault, battery, false arrest, false imprisonment, abuse of process and malicious prosecution, committed by law enforcement and corrections officers. *See* 28 U.S.C. § 2680(h); *Millbrook v. United States*, 569 U.S. ___, 133 S.Ct. 1441, 1443 (2013).

### a. Parties not suable

I quickly set aside defendants that are not amenable to suit: the District Court itself, the U.S. Attorney's Office, and the Bureau of Prisons. They are not themselves the United States, which is the only proper defendant in a FTCA action. *See FDIC v. Meyer,* 510 U.S. 471, 484–85 (1994). They are not suable as individual federal "officers" under *Bivens. See Malesko, supra.* Nor does plaintiff identify any other waiver of sovereign immunity that would permit him to sue these governmental entities. Polidoro does not suggest any basis for imposing

---

[12]     The FTCA also requires, in advance of suit, presentation of the claim to the appropriate federal agency and exhaustion of administrative remedies. 28 U.S.C. § 2675. There is no indication that this was done, but presumably this lapse, too, would be part of Polidoro's malpractice claim against Saluti. In a FTCA action, plaintiff is not entitled to a jury trial, and cannot recover punitive damages.

vicarious liability on the government or supervisory personnel not directly involved in the actions of which he complains. As to any constitutional claim, that is a particularly problematic omission, because *respondeat superior* does not apply to a *Bivens* claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Furthermore, individual defendants acting in their official capacities are not subject to suit under Section 1983 or *Bivens. See Chavarriaga v. New Jersey Dep't of Corr.*, __ F.3d __, 2015 WL 7171306, at *6 n.9 (3d Cir. Nov. 16, 2015) ("[Section] 1983 does not create a cause of action against states or state officials acting in their official capacities.") (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 71 (1989)); *Blanchard v. Gallick*, 448 F. App'x 173, 175 (3d Cir. 2011) ("An action against government officials in their official capacities constitutes an action against the United States; and claims against the United States are barred by sovereign immunity, absent an explicit waiver."). Such suits may be brought only against officers in their individual capacities. *See FDIC*, 510 U.S. at 485.

### b. Immunity, absolute or qualified

As to individual defendants, immunity poses an additional barrier to suit. (I here address the *Bivens* aspect; individuals cannot be sued under the FTCA.) The presiding District Judge and the Assistant United States Attorney are absolutely immune for acts performed in their official capacities. *See generally Mireles v. Waco*, 502 U.S. 9, 11 (1991) (absolute judicial immunity for judge acting in judicial capacity); *Stump v. Sparkman*, 435 U.S. 349, 362 (1978) (same); *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976) (prosecutorial immunity); *Burns v. Reed*, 500 U.S. 478, 492 (1991) (same).

Other individuals, such as prison personnel, enjoy a lesser, qualified immunity. Government officials performing discretionary functions are generally "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[13]

The CIM segregation of Mr. Polidoro, his belated transfer out of Fort Dix, his security classification in prison, and the denial of admission to a boot camp or halfway house program, do not violate any clearly established right:

> [I]t is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. *Moody v. Daggett,* 429 U.S. 78, 88 (1976); *Montanye v. Haymes,* 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the [challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." *Id.* Similarly, it has long been recognized that prison transfer decisions, standing alone, do not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. *See, e.g., Hassain v. Johnson,* 790 F.2d 1420 (9th Cir. 1986); *Serrano v. Torres,* 764 F.2d 47 (1st Cir. 1985). In short, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment; *See, e.g., Gov't of Virgin Island v. Gereau,* 592 F.2d 192 (3d Cir. 1979) (transfer from Virgin Islands to mainland); *Rodriguez–Sandoval v. United States,* 409 F.2d 529 (1st Cir. 1969) (transfer from Puerto Rico to Atlanta), and it is well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, to any security classification, or to any particular housing assignment. *See Olim v. Wakinekona,* 461 U.S. 238, 245 (1983); *Meachum v. Fano,* 427 U.S. 215, 225 (1976); *Montanye,* 427 U.S. at 242; *Bulger v. U.S. Bureau of Prisons,* 65 F.3d 48 (5th Cir. 1995); *Marchesani v. McCune,* 531 F.2d 459 (10th Cir.), *cert. denied,* 429 U.S. 846 (1976).

*Jamison v. Wetzel,* 2015 WL 791444, at *7 (M.D. Pa. Feb. 25, 2015) (adopting Report & Recommendation of Magistrate Judge). Recently, the United States Court of Appeals for the Third Circuit reaffirmed those principles:

> [A]n inmate does not have the right to "be placed in any particular prison," including halfway homes and community release programs. *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532,

---

[13]     The immunity analysis under *Bivens* is parallel to the familiar § 1983 analysis. *See, e.g., Wilson v. Layne,* 526 U.S. 603, 609 (1999); *Graham v. Connor,* 490 U.S. 386, 394 n.9 (1989); *Malley v. Briggs,* 475 U.S. 335, 340 n.2 (1986).

2538 (1976); *Asquith v. Dep't of Corr.*, 186 F.3d 407, 411-12 (3d Cir. 1999). A state has broad authority to confine an inmate in any of its institutions. *Meachum*, 427 U.S. at 224, 96 S.Ct. at 2538. Thus, courts recognize that a state's authority to place inmates anywhere within the prison system is among "a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Id.* at 225, 96 S.Ct. at 2538. Consequently, custodial personnel do not infringe an inmate's liberty interests by placing her in one custodial facility rather than another. *Id.*

*Chavarriaga*, 2015 WL 7171306 at *6.

Absolute immunity as to the judge and prosecutor, and qualified immunity as to the prison personnel, would very likely have posed an insuperable barrier to relief as to the *Bivens* claims against them.

### 3.    Analysis of claims

Assuming that Polidoro's complaint could have overcome those threshold barriers, his suit would have faced further, substantive obstacles. These potential causes of action are seriously flawed, both factually and legally.

#### i. *Polidoro's denial that he truly pled guilty to Count 1*

By Polidoro's own account, the majority of his claims—*e.g.,* that he should not have been segregated, or that he should have been admitted to a boot camp or halfway house—flow from a single error. These events happened, he says, primarily because prison officials relied on the Judgment in his criminal case. (ECF No. 55-5, p. 14) That Judgment, according to Polidoro, reflects the wrong offense of conviction. He says that he never pled guilty to Count 1, or at least that he never intended to. The decisions of which he complains were all based on the various officials' having taken that Count 1 conspiracy conviction at face value; had they recognized that he was at worst guilty of Count 3, they would not have considered Polidoro a danger, segregated him, or denied him boot camp or halfway house status.

Every step of that argument is belied by the record. Consider, for example, the guilty plea itself.

Polidoro does not attach the plea agreement or the transcript of the guilty plea to his papers. Instead, he attaches his application to plead guilty (commonly known as a "Rule 11 form"). (ECF No. 55-5, pp. 4–11) In answer to Question 20 of the Rule 11 form, Polidoro acknowledged that there was a written plea agreement and that he had discussed it with his counsel. (*Id.* at p. 8) In answer to Question 20A ("The substance of the plea agreement is:"), Polidoro wrote "plea to 1 count of extortionate extension of credit and be sentenced at a level 15." (*Id.*)

Based on this, his own handwritten notation, Polidoro argues that he did not actually plead guilty to Count 1, the racketeering conspiracy. The full record of the plea, however, makes it crystal clear that he did.

Start with the written plea agreement, which is embodied in a letter dated February 10, 1999, and filed with the Court on February 24, 1999. (Crim. No. 98-560, ECF No. 66).[14] The first operative sentence of the letter states that "the United States will accept a guilty plea from James Polidor[o] to Count One of the Indictment, Criminal No. 98-560 (AMW), which charges the defendant with Racketeering Conspiracy (specifically Racketeering Acts 2, 6, 7, 8 and 21), in violation of 18 U.S.C. § 1962(d)." (*Id.* at p. 1) The United States agrees at sentencing to "move to dismiss Counts 2, 3, 6 through 10 and 21 of the Indictment" as against Polidoro. (*Id.*) For purposes of the Sentencing Guidelines, Polidoro stipulates with the government that "the underlying racketeering activity is loansharking." (*Id.* at p. 5) The agreement is signed by Polidoro and his counsel, Mr. Giannetta. (*Id.* at p. 4)

On February 24, 1999, at the entry of the guilty plea, the Court initially confirmed with counsel that this was a plea to Count 1:

---

[14]     Polidoro did not supply a copy of the plea agreement with his papers, and his counsel was unable to produce it in response to a request from chambers. My clerk therefore requested a copy from the United States Attorney's Office. Seemingly documents could not be uploaded and linked to the CM/ECF system as it existed in 1999. On November 17, 2015, the plea agreement was uploaded to the CM/ECF system, Crim. No. 98-560, Document no. 66.

>THE COURT: I understand that each of your respective clients wants to retract their prior plea of not guilty, and … Mr. Polidoro wants to enter a plea of guilty to Count 1…. Is that correct?
>…
>MR. GIANNETTA [counsel for Polidoro]: That's correct, your Honor.

(Transcript of guilty plea, Feb. 24, 1999 ("Plea Tr."), p. 3)

The Court directly addressed Polidoro, and confirmed that Polidoro had "read Count 1 of the indictment as well as the respective Racketeering Acts that refer to you as an individual"; that Polidoro did "understand the Racketeering Acts and the conspiracy with which [he is] charged"; that Polidoro had had "an opportunity to discuss the indictment with … counsel"; and that counsel had explained to Polidoro "what the Government would have to prove in order to find [him] guilty of the offense or offenses charged beyond a reasonable doubt." (Plea Tr. 7–8)  To each query, Polidoro answered "Yes, sir." (*Id.*)

The Court then discussed with Polidoro the Rule 11 form, containing Polidoro's own handwritten description of the charge. Polidoro discussed the Rule 11 form with the Court, but expanded on that handwritten notation. Polidoro acknowledged that he fully understood that he was pleading guilty to Count 1, the racketeering conspiracy:

>THE COURT: Mr. Polidoro, it indicates in yours [*i.e.*, Polidoro's Rule 11 form] that you're going to engage in or you understand the charge is that you engaged in a racketeering conspiracy, particularly, extortionate extension of credit; is that correct?
>DEFENDANT POLIDORO: Yes, sir.

(Plea Tr. p. 13)

Judge Wolin again confirmed that this was a plea to Count 1:

>THE COURT: All right, Mr. Polidoro, while I have you there, you're going to plead guilty to a racketeering conspiracy, involving extortionate extension of credit; correct?
>…
>DEFENDANT POLIDORO: Yes, sir.

(Plea Tr. p. 14)

And again:

> THE COURT: .... And you also have a plea agreement; is that correct?
> DEFENDANT POLIDORO: Yes, sir.
> THE COURT: And you're going to plead guilty to Count 1 of the indictment, which is a conspiracy involving extortionate extension of credit, and you're going to be a a – you believe a level 15. True?
> DEFENDANT POLIDORO: Yes, sir.

(Plea Tr. p. 15)

And again:

> THE COURT: Okay. And, Mr. Polidoro, the Government says to you that if you're sentence on Count 1, the racketeering conspiracy involving Racketeering Acts 2, 6, 7, 8 and 21, they will not bring any further charges against you relating to racketeering activities or other criminal conduct relating to the events detailed in the indictment. Is that correct?
> DEFENDANT POLIDORO: Yes, sir.
> THE COURT: And at time of sentence, they indicate to you, sir, that they'll dismiss Counts 2, 3 and 6 through 10, and 21 of the indictment; correct?
> DEFENDANT POLIDORO: Yes, sir.

(Plea Tr. pp. 18–19)

The transcript reflects that Polidoro and the United States executed a written agreement to plead guilty to Count 1, the racketeering conspiracy. And in open Court, Polidoro repeatedly states under oath that he understands he is pleading guilty to Count 1. Although he now claims that his plea should properly be understood as a plea to Counts 3 or 6–10, he acknowledged on the record, again under oath, that those very counts would be *dismissed* as part of his plea bargain.

There is no chance that a fact finder could be persuaded that Mr. Polidoro knowingly pled guilty to anything but Count 1.

> ## ii. Polidoro's contention that because he made no "threats," subjecting him to an order of separation in prison or denying him lower-security confinement would have been actionable

Polidoro makes a related argument that he merely collected gambling proceeds, and never threatened anyone. It follows, he says, that his segregated

status and ineligibility for halfway house or boot camp programs were wrongful, and that he should receive an award of damages.

Once again, the record renders any such claim highly problematic. Under oath, Polidoro acknowledged that he was pleading guilty to Count 1, specifically in relation to certain racketeering acts: numbers 2, 6, 7, 8 and 21. Racketeering Act 2 was charged as a conspiracy to collect credit by "extortionate means." Racketeering Acts 6, 7, and 8 were substantive collections of credit by extortionate means, in violation of 18 U.S.C. § 894. Racketeering Act 21 was the conducting of an illegal sports bookmaking business. (Indictment, ECF No. 55-6, pp. 12–14)

To begin with, there is nothing benign about the use of "extortionate means," as Polidoro seems to imply. "Extortionate means" is defined in 18 U.S.C. § 891(7) as "any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any other person."

Polidoro himself removed all doubt. In stating the factual basis for the plea, Polidoro admitted that his collections of payments from bettors at a 45% interest rate were backed by the express or implied threat of violence or criminality:

> THE COURT: Now, during the time period between January 1990 and December 1994, did you along with Nicholas Olivieri and others conspire to collect extensions of credit by extortionate means; that is, did you collect money that was loaned at an interest rate in excess of 45 percent a year and then collect that money with the understanding between the lender and the borrower, express or implied, that if the borrower delayed in making the repayments or if there was a total failure to repay, *violence or other criminal means would be used to force repayment?*
>
> DEFENDANT POLIDORO: Yes, sir.

(Plea Tr. p. 33) (emphasis added) True, there was no proffer that *each* collection of money was accompanied by a formal repetition of the threat of violence. But that was the understanding, as defendant himself admitted. (And it is hard to imagine a debtor paying 45% interest on any but the strongest compulsion.)

Polidoro further admitted that he was no incidental participant in the extortion conspiracy and illegal sports bookmaking operation for which the debts were collected. He was a full conspirator with these organized crime figures, and an equity participant in the profits. (Plea Tr. pp. 31–34)

In short, the Judgment in this case accurately reflected the Count 1 offense to which Polidoro pled guilty. Nothing about the charge or the guilty plea required the prison authorities to treat Polidoro as a harmless participant.

### iii. Polidoro's claims relating to his guilty plea, security status and transfer were not legally viable

In light of these facts of public record and the applicable law, Polidoro's claims in relation to his guilty plea, his prison security status, and his prison transfer could not have succeeded. The facts simply do not support them. The law bars them. And these were all non-actionable exercises of judicial or administrative discretion.

Judge Wolin and his clerk committed no actionable wrong when they declined to "correct" the Judgment to reflect Polidoro's position that he did not plead guilty to the Count 1 conspiracy. That is precisely what he did plead guilty to.

Facts aside, there is an insurmountable legal barrier to pursuing any claim that would require challenging or setting aside a criminal conviction. In *Heck v. Humphrey,* 512 U.S. 477 (1994), the Supreme Court rejected the use of Section 1983 as an indirect means of challenging the underlying criminal judgment:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state

prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck,* 512 U.S. at 486–87; *see also McKinney v. Prosecutor's Office,* 2014 WL 2574414, at *3 (D.N.J. June 4, 2014), *reconsideration denied,* 2015 WL 1954460 (D.N.J. Apr. 29, 2015).

Polidoro's claim that his plea to Count 1 was "really" a plea to Count 3, or Counts 6–10, is just such a claim. *Heck* bars that claim. *Heck* likewise cuts off all claims against downstream defendants, to the extent such claims are premised on the invalidity of Polidoro's plea to Count 1. Before proceeding with any such claim, Polidoro would need to have successfully challenged the accuracy or validity of that conviction. That he did not and could not do. For the reasons expressed above, he had no basis to attack his guilty plea, or to file a motion to "correct" it. *See* Fed. R. Crim. P. 35, 36. Moreover, by the time he approached Saluti to represent him, the time to appeal that conviction had expired, as had the deadline to file a motion under 28 U.S.C. § 2255. *See* Fed. R. App. P. 4(b) (14 days to appeal); 28 U.S.C. § 2255(f) (one year statute of limitations); *see also Gilles v. Davis,* 427 F.3d 197, 209–10 (3d Cir. 2005) (*Heck* favorable-termination rule applies even when the plaintiff is no longer in custody and cannot pursue habeas relief).[15]

---

[15]   As to a FTCA claim, I take as my guide the Third Circuit's persuasive, albeit non-precedential, suggestion that *Heck* applies:

In addition, we have not addressed in a precedential opinion whether *Heck* applies to FTCA actions. For purposes of this appeal, however, we will "assume that the exception of Heck extends to FTCA claims." *Morrow v. Fed. Bureau of Prisons,* 610 F.3d 1271, 1272 (11th Cir. 2010); *see also Erlin v. United States,* 364 F.3d 1127, 1133 (9th Cir. 2004) (holding that "a civil action under the Federal Tort Claims Act for negligently calculating a prisoner's release date, or otherwise wrongfully imprisoning the prisoner, does not accrue until the prisoner has established, in a direct or collateral attack on his imprisonment, that he is entitled to release from custody."); *Parris v. United States,* 45 F.3d 383, 384–85

And factually, there can be no viable claim that arises from alleged misidentification of the offense of conviction. There is and could be no showing, for example, that the AUSA misinformed the Bureau of Prisons as to the nature of Polidoro's conviction. It was and is a conviction of the Count 1 conspiracy.

In light of that fact, the downstream participants in the prison system committed no wrong in relying on Polidoro's plea of guilty to this serious RICO conspiracy offense, in which the relevant enterprise was an organized crime faction. The prison authorities committed no error as to the identity or seriousness of the offense of conviction. No error as to the offense of conviction caused them to misclassify Polidoro or deny him a lower security level of imprisonment.

That being the case, it is extremely doubtful whether such security classifications or administrative segregation, even if substantively erroneous, would give rise to a civil rights claim. *See* cases cited at pp. 13–16, *supra; see also Sandin v. Conner,* 515 U.S. 472, 484 (1995) (denying due process claim based on separate confinement, requiring "atypical and significant hardship" in relation to ordinary burdens of prison life and segregated confinement); *Chavarriaga,* 2015 WL 7171306 at *7 ("[T]he Due Process Clause do[es] not give an inmate a liberty interest in being housed in a particular institution or at a particular custody level."); *Smith v. Mensinger,* 293 F.3d 641, 654 (3d Cir. 2002) (7 months' disciplinary confinement does not in itself infringe a protected liberty interest). *But see Allah v. Bartkowski,* 574 F. App'x 135 (3d Cir. 2014) (overturning dismissal of Eighth and Fourteenth Amendment claims of prisoner allegedly placed in solitary confinement for six years, denied adequate exercise, deprived of sleep and basic sanitation).

Assuming the truth of Polidoro's allegations, the warden would nevertheless have acted within the proper bounds of discretion in concluding

---

(10th Cir. 1995) (holding that *Heck* applies to actions brought under the FTCA).

*Priovolos v. FBI,* 2015 WL 6851547, at *2 n.2 (3d Cir. Nov. 9, 2015).

that Polidoro should be denied halfway house confinement as a "threat to the community" based on his "instant offense and associations." No flaw in the decision-making or appeal procedure has been identified. Polidoro has identified no cause of action under which that decision, even if erroneous, could give rise to an award of damages. *See Chavarriaga,* 2015 WL 7171306 at *6 ("But an inmate does not have the right to 'be placed in any particular prison,' including halfway homes and community release programs...Thus, courts recognize that a state's authority to place inmates anywhere within the prison system is among 'a wide spectrum of discretionary actions[.]'") (citing *Meachum v. Fano,* 427 U.S. 215, 224–25 (1976)); *Asquith v. Dep't of Corr.,* 186 F.3d 407, 410 (3d Cir. 1999) ("[A] prisoner does not have a liberty interest in remaining in a preferred facility within a state's prison system.").

Viewed as FTCA tort claims, these are likewise matters of broad administrative discretion, subject to the discretionary function exception. *See Santana-Rosa v. United States,* 335 F.3d 39, 44 (1st Cir. 2003) ("[D]ecisions with regard to classification of prisoners, assignment to particular institutions or units, and allocation of guards and other correctional staff must be viewed as falling within the discretionary function exception to the FTCA, if penal institutions are to have the flexibility to operate.") (citing *Cohen v. United States,* 151 F.3d 1338, 1344 (11th Cir. 1998) and *Calderon v. United States,* 123 F.3d 947, 949–50 (7th Cir. 1997)); *Huff v. Neal,* 555 F. App'x 289, 298–99 n.9 (5th Cir. 2014) (placement of prisoner in particular unit fell into exception regardless of whether plaintiff brought claim on negligence or intentional tort theory); *Donaldson v. United States,* 281 F. App'x 75, 78 (3d Cir. 2008) (BOP decisions regarding protection of inmates, including returning inmate to general population, fell within exception). I note in passing that, of course, *failure* to segregate an inmate in response to potential danger might likewise be wrongful. *See generally Farmer v. Brennan,* 511 U.S. 825 (1994) (*Bivens* claim under Eighth Amendment for failure to protect prisoner from known

substantial risk of violence from fellow inmates). Balancing such considerations is essentially an exercise of administrative discretion.

Polidoro cites no basis for what seems to be his legal position—that the prison authorities' security and classification decisions must be based solely on the prisoner's admissions in open court at his guilty plea.[16] To the contrary, such decisions are necessarily fact-sensitive, and may rest on a broad range of information about the prisoner himself, prison conditions, and fellow prisoners.

In short, Polidoro's hypothetical claims that a misunderstanding about his offense of conviction led to onerous conditions of confinement would not have survived a motion to dismiss, let alone summary judgment. It is therefore unlikely that any of the potential defendants would have regarded these claims as possessing more than nuisance value.

## C.    Miscellaneous Claims

Polidoro additionally alleges that he wanted Saluti to include in his lawsuit certain miscellaneous claims based on alleged abuse and arbitrary behavior by prison personnel, including

    a. Ethnic slurs by Lieuts. Nesbitt and Garraway

    b. Squeezing of his genitals by Garraway

    c. Failure to investigate his complaints

    d. Overcrowding, threatening conditions, and other discomforts.

    e. Interference with mail and phone privileges.[17]

---

[16]    All of the foregoing implies, moreover, that there exists no intentional tort claim cognizable under FTCA.  False arrest or false imprisonment, for example, require "(1) an arrest or detention of the person against his or her will; and (2) lack of proper legal authority or legal justification." *Mesgleski v. Oraboni*, 748 A.2d 1130, 1138 (N.J. Super. Ct. App. Div. 2000) (quoted in *Cottrell v. Murphy's Auto Care & Performance Ctr.*, 2015 WL 3604085, at *4 (D.N.J. June 8, 2015) (Hillman, J.)).  The "lack of legal justification" here supposedly consists in the misidentification of the offense of conviction. That, as we have seen, simply did not occur.

[17]    To his amended complaint, Polidoro adds a claim that Saluti falsely represented that insurance would be available to cover a malpractice claim against him. That misrepresentation, made in Saluti's bankruptcy case, allegedly led Polidoro to abandon an adversary proceeding against Saluti, move to lift the automatic stay on consent, and pursue his action in this forum. (AC ¶¶ 29–51) To that, there are several

I set aside the threshold barriers outlined in Section III.B.2, *supra*. I nevertheless conclude that these miscellaneous claims, too, have few indicia of viability or significant dollar value.

The *Jamison* case, cited above, while not binding on this Court, once again usefully summarizes the applicable law. As to verbal harassment and an isolated incident of touching, established law does not suggest that Polidoro has a valuable, or even viable, claim:

> [I]t is well settled that "verbal harassment of a prisoner, although deplorable, does not violate the [constitution]. See McBride v. Deer, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001); *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000); *see also Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (rejecting the Eighth Amendment claim of a prisoner who alleged that he "was verbally harassed, touched, and pressed against without his consent" because "[n]o single incident that he described was severe enough to be 'objectively, sufficiently serious.'")." *Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006). *See, e.g., Rister v. Lamas*, 4:CV–10–1574, 2011 WL 2471486 (M.D. Pa. June 21, 2011); *Patterson v. Bradford*, CIV. 10–5043 NLH, 2011 WL 1983357 (D.N.J. May 20, 2011); *Williams v. Bradford*, CIV. 10–5120 JBS, 2011 WL 1871437 (D.N.J. May 13, 2011); *Ringgold v. Lamby*, 565 F. Supp. 2d 549, 553 (D. Del. 2008); *Sharpe v. Costello*, 1:06 CV 1493, 2007 WL 1098964 (M.D. Pa. Apr.11, 2007); *Edwards v. Wetzel*, 3:12–CV–1933, 2013 WL 3188569 (M.D. Pa. Mar. 25, 2013), report and recommendation adopted in part, 3:12–CV–1933, 2013 WL 3188723 (M.D. Pa. June 21, 2013).

*Jamison,* 2015 WL 791444 at *8.

No more hospitable to Polidoro's claims are the standards governing general complaints about conditions of confinement:

> The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a

---

responses. First, I have found little likelihood of more than a minimal recovery here. Second, the misrepresentation had few if any consequences; Saluti's statement that malpractice coverage was available did not make it so, and the falsity of that statement did not take anything away from Polidoro. At most, it would have occasioned some unnecessary expenditure of attorney's fees in shuffling between bankruptcy court and this Court. Such fees are already covered by my award in section III.A, *supra*. Third, any further claims relating to misrepresentations in connection with the bankruptcy case should be raised in that case.

maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). *See Atkinson v. Taylor*, 316 F.3d 257, 272 (3d Cir. 2003).

*Id.* at *10.

The necessary showing, then, is twofold, and it contains both an objective and a subjective component:

[A]n inmate's claim that she was [deprived of an identifiable human need] does not rise to the level of an Eighth Amendment violation unless: (1) the prison official deprived the prisoner of the minimal civilized measure of life's necessities; and (2) the prison official acted with deliberate indifference in doing so, thereby exposing the inmate to a substantial risk of serious damage to her future health. *Farmer v. Brennan*, 511 U.S. 825, 843, 114 S.Ct. 1970, 1977 (1994).

*Chavarriaga,* 2015 WL 7171306 at *7.

Prisoners may thus be expected to endure hardships short of the Eighth Amendment threshold of cruel and unusual punishment. Sporadic deprivations and discomforts, even if quite significant, do not rise to the level of a viable constitutional claim:

[Thus,] the "purported deprivation of a single meal is not of such magnitude as to rise to the level of a constitutional violation. *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir.1983) (only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim)." *Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009). Furthermore, court have held that a brief interruption in water service to an inmate's cell does not, by itself, so deprive an inmate of "the minimal civilized measure of life's necessities[,]" *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59(1981), that it constitutes a violation of the Eighth Amendment. *Banks v. Mozingo*, 423 F. App'x 123, 127–28 (3d Cir. 2011), citing *Williams v. Delo*, 49 F.3d 442, 444–47 (8th Cir. 1995) (finding no Eighth Amendment violation where prisoner was placed in a strip cell without clothes, the water in the cell was turned off and the mattress removed, and prisoner's bedding, clothing, legal mail, and hygienic supplies were withheld).

*Jamison,* 2015 WL 791444 at *11.

Polidoro's miscellaneous allegations, taken separately or together, do not approach the severity of those that have been found *not* actionable under settled case law. In addition, he specifies no particular damages. These allegations—an isolated insult, interference with mail, and the like—by their nature did not create substantial injury and would not furnish a basis for substantial damages.

And again, viewed as tort claims, most of Polidoro's complaints would fall within the discretionary function exception to FTCA. They relate to the running of the prison. The genital squeezing incident and ethnic slurs, which could conceivably be intentional torts (carrying them outside the discretionary-function exception), could not have resulted in significant damages.

In short, Polidoro's miscellaneous allegations would be unlikely to survive dispositive motion practice. And even if they did, there is no showing that they would support a significant award of damages.[18]

## CONCLUSION

I will enter a default money judgment in favor of Polidoro, and against Saluti. That judgment will consist of the full amount of the claimed liquidated damages, $12,820.13. (*See* Section III.A, *supra.*) For the reasons expressed above, I estimate, based on the "suit-within-a-suit" analysis, that a defendant would not have assigned the remaining claims anything more than nuisance

---

[18]   Polidoro makes no specific showing as to the likelihood of a settlement. These defendants, federal agencies and officers, have an institutional interest in deterring such claims, and they tend to oppose prisoner claims vigorously. Collectability of any judgment is a neutral factor. There is no evidence either way, but I will make the plaintiff-friendly assumption that any individual defendants might well have been indemnified by their financially solvent federal employers.

value; as to them, I award the sum of $5,000. (*See* Sections III.B & C, *supra*.) Judgment will be entered in a total amount of $17,820.13.

Dated:  December 4, 2015


_____

**HON. KEVIN MCNULTY, U.S.D.J.**